**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| JOSH WRIGHT, CASEY WRIGHT, and MICHAEL WRIGHT, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:24-cv-02156-TLP-cgc |
| THOMAS VILSACK, in his official capacity as Secretary of Agriculture, MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service, U.S. DEPARTMENT OF AGRICULTURE, and ANIMAL AND PLANT HEALTH INSPECTION SERVICE, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

---

**ORDER ON MOTION TO DISMISS**

---

Plaintiffs Josh, Casey, and Michael Wright sued here over disqualifications of Plaintiffs'

horses from competing in Tennessee Walking Horse shows.  (ECF Nos. 1, 49.)  Plaintiffs sued

Defendants Secretary of Agriculture Brooke Rollins,[1] Administrator of the Animal and Plant

Health Inspection Service Michael Watson, the United States Department of Agriculture

("USDA"), and the Animal and Plant Health Inspection Service ("APHIS").  (*Id.*)  Defendants

moved to dismiss Plaintiff's Second Amended Complaint.  (ECF No. 50.)  Plaintiffs opposed the

---

[1] Plaintiffs initially sued Thomas Vilsack as the Secretary of Agriculture, but he no longer holds that position.  The Court respectfully **DIRECTS** the Clerk to update the docket to reflect the current Secretary of Agriculture as Brooke Rollins.

1

motion.  (ECF No. 51.)  And Defendants replied.  (ECF No. 59.)  The State of Tennessee also filed an amicus brief.  (ECF Nos. 55, 56.)

Having reviewed the record and for the reasons below, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss.

## <u>BACKGROUND</u>

Soring is a practice of using chemicals, tools, or other mechanisms which cause harm or pain to a horse, generally to try to exaggerate the animal's gait.  *See* 15 U.S.C. § 1821(3).  The Horse Protection Act ("HPA") is a federal statute that bars people from showing or selling sore horses.  15 U.S.C. §§ 1823(a)–(b), 1824.  And to enforce the statute, show managers must appoint qualified inspectors to look for sore horses and then disqualify those horses from competition.  15 U.S.C. § 1823.

Plaintiffs Josh, Casey, and Michael Wright train Tennessee Walking horses who compete in shows.  (ECF No. 49 at PageID 612.)  And at competitions from 2022 to 2024, the USDA disqualified some of their horses, claiming that Plaintiffs violated the HPA's soring prohibition.  (*Id.* at PageID 630–33.)  Plaintiffs now bring seven claims to challenge certain provisions of the HPA and related regulations that led to the disqualifications.  (*See generally id.*)  The first claim challenges the constitutionality of disqualifying sore horses without a review or appeal process.  (*Id.* at PageID 635–36.)  And the remaining claims challenge specific standards by which the USDA finds horses to be "sore."  (*Id.* at PageID 636–45.)

Defendants move to dismiss this action, arguing that the statute of limitations bars the first four claims and that the remaining three claims do not relate to final agency action and fail as a matter of law.  (ECF No. 50.)  The Court will set out the proper standard of review before addressing each of Defendants' arguments.

## STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff generally must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Courts must accept a plaintiff's factual assertions as true and resolve all reasonable inferences in his or her favor.  *Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 833 (6th Cir. 2024); *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 455 (6th Cir. 2024).  But "a pleading that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *FedEx*, 97 F.4th at 455 (quoting *Twombly*, 550 U.S. at 555); *see also Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 717 (6th Cir. 2022) ("Only factual allegations in the complaint are taken as true; conclusory statements and legal conclusions, even if couched as a factual allegation, are not entitled to be assumed true." (quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79, 681 (2009))).

Courts generally restrict their review of the record to the complaint, but they "may review exhibits attached to the complaint as well as items appearing in the record of the case."  *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024).  And a court may dismiss an action based on a statute of limitations defense when the "allegations in the complaint affirmatively show that the claim is time-barred."  *Wershe v. City of Detroit*, 112 F.4th 357 (6th Cir. 2024); *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013).  The Court thus considers the exhibits attached to the Second Amended Complaint (*see* ECF No. 49) and will review Defendants' time-bar argument (*see* ECF No. 50).

## GOVERNING LAW

In 1970, Congress enacted the HPA to protect horses from unfair competition practices and to preserve legitimate competition. *See* 15 U.S.C. § 1822. At its core, the HPA prohibits showing or selling "sore" horses. 15 U.S.C. §§ 1823(a)–(b), 1824. And under the HPA, a horse is "sore" when

> (A) an irritating or blistering agent has been applied, internally or externally, by a person to any limb of a horse,
>
> (B) any burn, cut, or laceration has been inflicted by a person on any limb of a horse,
>
> (C) any tack, nail, screw, or chemical agent has been injected by a person into or used by a person on any limb of a horse, or
>
> (D) any other substance or device has been used by a person on any limb of a horse or a person has engaged in a practice involving a horse,
>
> and, as a result of such application, infliction, injection, use, or practice, such horse suffers, or can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving, except that such term does not include such an application, infliction, injection, use, or practice in connection with the therapeutic treatment of a horse by or under the supervision of a person licensed to practice veterinary medicine in the State in which such treatment was given.

15 U.S.C. § 1821(3). In other words, soring is hurting a horse to exaggerate its gait and thereby improve its performance at competition. *See id.*; *see also* 89 F. Reg. 39194, 39241 (May 8, 2024) (defining soring as "intentionally injuring a horse's front feet and limbs to cause pain so intense that the horse lifts its legs quickly to relieve the pain when its hooves strike the ground, thereby producing a distinctive high-stepping gait").

To implement the HPA's soring ban, Congress granted the Secretary of Agriculture power "to issue such rules and regulations as he deems necessary to carry out the provisions of this chapter," including the requirements for appointing horse inspectors. 15 U.S.C. § 1828; *see*

*also* 15 U.S.C. § 1821(2); 15 U.S.C. § 1823(c) (authorizing the Secretary of Agriculture to "prescribe by regulation requirements for the appointment . . . of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter"). The regulations also set standards for how USDA inspectors find a horse to be sore. 9 C.F.R. §§ 11.4, 11.21. And Plaintiffs challenge two of these standards: the Scar Rule and the post-show inflammation policy. (ECF No. 49 at PageID 636–42, 642–45.) Plaintiffs also allege that the lack of review procedures for horses disqualified for being sore under these (or any other) standards violate due process. (*Id.* at PageID 635–36.) The Court will now discuss the Scar Rule, the post-show inflammation policy, and disqualification appeal procedures.

## I.     Scar Rule

One standard by which the USDA finds a horse to be sore is under the Scar Rule. The Scar Rule states that

> Horses subject to this rule that do not meet the following scar rule criteria shall be considered to be "sore" and are subject to all prohibitions of section 5 of the Act. The scar rule criteria are as follows:
>
> (a) The anterior and anterior-lateral surfaces of the fore pasterns (extensor surface) must be free of bilateral granulomas, other bilateral pathological evidence of inflammation, and, other bilateral evidence of abuse indicative of soring including, but not limited to, excessive loss of hair.
>
> (b) The posterior surfaces of the pasterns (flexor surface), including the sulcus or "pocket" may show bilateral areas of uniformly thickened epithelial tissue if such areas are free of proliferating granuloma tissue, irritation, moisture, edema, or other evidence of inflammation.

9 C.F.R. § 11.3.[2] In layman's terms, a horse is sore (and cannot compete) if it has "excessive" hair loss on parts of its legs or if it has scars on the parts of legs and shows signs of irritation or

---

[2] In 2024, new HPA regulations were supposed to replace the Scar Rule. *See* 89 F. Reg. 39194, 39247 (May 8, 2024) (to be codified at 9 C.F.R. § 11.7). The new rule would have "presumed" a horse to be sore if, "upon inspection,"

swelling.  *See id.*  And even though the Scar Rule named excessive hair loss as one basis for

disqualification, *id.*, the USDA allegedly considered it a necessary condition for disqualification

(ECF No. 49 at PageID 626–27).  Put another way, inspectors would not find that someone

violated the Scar Rule *unless* the horse had excessive hair loss, but hair loss would *always* result

in disqualification.  This rule reflected horse owners' and trainers' "commonsense understanding

that hair would not grow on a scar."  (*Id.* at PageID 607.)  But, according to Plaintiffs, this

application of the Scar Rule ignores the reality that horses may experience hair loss from natural

conditions or approved training methods, making it a poor standard for identifying soring.  (*See

id.* at PageID 622–23.)

At any rate, in March 2024, the USDA emailed horse inspectors to explain that the

"USDA will no longer require hair loss associated with non-compliant tissue (i.e., non-uniformly

thickened epithelial tissue or evidence of inflammation) in order to disqualify a horse."  (ECF

No. 49-1; *see* ECF No. 49 at PageID 627.)  This change in approach would allow inspectors to

disqualify horses under the Scar Rule even if the horse has no hair loss.  (ECF No. 49 at PageID

627.)  And the USDA sent the email outlining this change without relying on any formal

procedures like notice-and-comment.  (*See* ECF No. 49-1; ECF No. 49 at PageID 607, 627.)

---

> any limb of a horse displays one or more dermatologic conditions that they
> determine are indicative of soring as that term is defined in 15 U.S.C. [§] 1821 . . .
> Examples of dermatologic conditions that will be evaluated in determining whether
> a horse is sore shall include, but are not limited to, irritation, moisture, edema,
> swelling, redness, epidermal thickening, and loss of hair (patchy or diffuse).

*Id.*  But the Northern District of Texas recently vacated portions of the rule.  *Tenn. Walking
Horse Nat'l Celebration Ass'n v. U.S. Dep't of Agric.*, 765 F. Supp. 3d 534 (N.D. Tex. 2025).
And no party to that action appealed, suggesting that the USDA may not be implementing the
amended rule.  In any case, Plaintiffs do not challenge the amended rule, and it seems the
original Scar Rule remains in place, meaning Plaintiffs' challenge here is not moot.  (*See* ECF
No. 68 at PageID 828–29.)

## II.    Post-Show Inflammation Policy

Another standard the USDA uses to disqualify horses as sore is the post-show

inflammation policy.  Under this policy, inspectors disqualify horses who exhibit swelling after a

competition, even if they passed pre-competition screening and inspections.  (ECF No. 49 at

PageID 628.)  At first, this policy applied only to swelling resulting from unnatural show or

competition practices, and "when a horse suffer[ed] inflammation as a result of a natural injury,

the horse [was] not sore within the meaning of the HPA."  (*Id.* at PageID 627 (emphasis

omitted).)  But in 2019, Plaintiffs allege that the "USDA adopted a new policy" that would allow

natural injuries, such a horse clipping its own feet during a show or suffering activity-induced

swelling (like a human athlete might), to qualify as grounds for disqualification.  (*Id.* at PageID

628–29.)

This new "policy," however, has unclear origins.  For example, there is no rule, policy

statement, regulation, or code requiring disqualification for swelling from natural causes.

Instead, the USDA removed language from its manual that had recognized natural inflammation

as permissible.  (*Id.* at PageID 629.)  And two Veterinary Medical Officers[3] commented that

natural inflammation "should" support disqualification.  (ECF No. 50 at PageID 690 (citing ECF

No. 49 at PageID 629); ECF No. 49-4.)

## III.    Review Procedures

When the USDA finds a horse to be sore under the Scar Rule, the post-show

inflammation policy, or some other soring regulation, the managers of competitions and shows

---

[3] According to the Second Amended Complaint, "[t]he USDA has delegated HPA enforcement
to APHIS. In turn, APHIS employs its own Veterinary Medical Officers ('VMOs')," who
"examine horses at competitions in pre- and post-show inspections."  (ECF No. 49 at PageID
618.)

must disqualify the animal.  15 U.S.C. § 1823; *see also* 9 C.F.R. §§ 11.4, 11.21 (setting out

inspection procedures).  If the disqualification occurs before the show, the horse cannot compete.

*See id.*  And if it happens after the event, the horse loses any titles or awards it earned.

According to Plaintiffs, a horse owner generally cannot challenge a USDA finding that a

horse is sore and subject to disqualification.[4]  *See* 15 U.S.C. § 1825(b).  (ECF No. 49 at PageID

619.)  In fact, Plaintiffs allege the regulations "do not provide any type of hearing prior to a horse

being disqualified from competition, nor do they provide any mechanism by which an owner or

trainer of a disqualified horse can contest the disqualification after the fact."  (ECF No. 49 at

PageID 619.)  That said, a horse owner or trainer can challenge a USDA finding if the USDA

brings an administrative complaint over the disqualification.  *See* 15 U.S.C. § 1825(b).  (*See* ECF

No. 49 at PageID 609, 619.)  But whether the USDA brings a complaint is within its discretion.

*See* 15 U.S.C. § 1825(b).  (*See* ECF No. 49 at PageID 619.)

## ANALYSIS

Relying on the HPA and regulations discussed above, the USDA disqualified some of

Plaintiffs' horses from competition, finding them to be sore under the Scar Rule and post-show

inflammation policy.  (ECF No. 49 at PageID 630–33.)  Plaintiffs could not challenge those

disqualifications.  (*Id.*)  They now allege that disqualifying their horses without review violates

the Fifth Amendment Due Process clause.  (*Id.* at PageID 635–36.)  And they claim that the Scar

Rule exceeds statutory authority, is arbitrary and capricious, is void for vagueness, and violates

notice-and-comment rulemaking requirements.  (*Id.* at PageID 636–42.)

---

[4] In 2024, the USDA proposed a regulation that created a review process for disqualifications.
(ECF No. 50 at PageID 679; ECF No. 68 at PageID 828–29.)  But that regulation is not before
this Court because Plaintiffs do not raise the issue and the Northern District of Texas vacated the
proposed amendments.  (*See id.*)  *See Tenn. Walking Horse Nat'l Celebration Ass'n*, 765 F.
Supp. 3d 534.

Plaintiffs also argue that the post-show inflammation policy exceeds statutory authority and violates notice-and-comment rulemaking requirements. (*Id.* at PageID 642–45.) They request declaratory and injunctive relief to "set[] aside each of the disqualifications of Plaintiffs' horses challenged in this lawsuit" and to "vacate and set aside" regulations and policies that are unlawful or do not provide an adequate opportunity to challenge disqualifications under them. (*Id.* at PageID 645–46.)

Defendants move to dismiss, arguing first that the statute of limitations bars Plaintiffs' claims that facially challenge the disqualification review process and the Scar Rule.[5] (ECF No. 50 at PageID 681–85.) Defendants also contend that the claims about the Scar Rule email and the post-show inflammation policy are not cognizable because there is no final agency action (*id.* at PageID 685–92) and because they fail as a matter of law (*id.* at PageID 692–94).[6] The Court will discuss each of Defendants' arguments now.

## I.    Claims I–IV: Statute of Limitations Defense

Plaintiffs' first four claims allege that the USDA's policies and regulations violate the Administrative Procedure Act ("APA"). The first claim asserts that the inability to seek review of horse disqualifications is unconstitutional. And the second, third, and fourth claims challenge the Scar Rule. Defendants move to dismiss each of these causes of action as time-barred. (ECF No. 50.)

---

[5] Plaintiffs assert both facial and as-applied challenges to the HPA regulations. They seek to "vacate and set aside" the regulations (ECF No. 49 at PageID 612, 645, 646) and their own prior disqualifications (*id.* at PageID 636, 638–40, 645).

[6] The Court will address the finality and merits arguments separately. Even though the Parties rely on the same reasoning for each argument, "[i]n this Circuit, the reviewability question is not jurisdictional. And whether the [challenged materials] are interpretive or legislative rules goes to the merits." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 598 n.20 (6th Cir. 2024) (citations omitted).

The Parties agree that the APA's 6-year statute of limitations applies to the claims here. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). (*See* ECF No. 50 at PageID 676; ECF No. 51 at PageID 705.)  But the Parties disagree as to when the claims accrued and therefore when the limitations period began to run.  Defendants argue that the statute of limitations for facial challenges began when Plaintiffs were first subject to the regulations, which was when they entered the horse training industry at least 15 years ago.[7] (ECF No. 50 at PageID 682.)  And Plaintiffs counter that the statute of limitations did not begin to run until the USDA disqualified their horses under the Scar Rule in 2022, 2023, and 2024. (ECF No. 51 at PageID 705–10.)

Two cases frame the issue: *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024), and *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015).  In *Corner Post*, a North Dakota store facially challenged a regulation related to debit card transaction fees. *Corner Post*, 603 U.S. at 805.  The Federal Reserve Board had promulgated the challenged regulation in 2011, but Corner Post did not open as a business until 2018.  *Id.*  It sued over the regulation in 2021.  *Id.* at 806.  The Federal Reserve Board argued that the APA lawsuit was time-barred because the regulation took effect more than six years before Corner Post sued.  *Id.* at 809.  And Corner Post countered that the statute of limitations did not begin to run until it began operating.  *See id.*

The Supreme Court explained that the APA statute of limitations for facial challenges begins running "after the right of action first accrues."  *Id.* at 808 (emphasis omitted) (quoting 28

---

[7] Michael Wright "has trained Tennessee Walking Horses for 40 years."  (ECF No. 49 at PageID 612.)  Casey Wright has done so for 25 years.  (*Id.*)  And Josh Wright has been in the industry for 15 years.  (*Id.*)

U.S.C. § 2401(a)). And a claim accrues "when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief'" and when she has "suffer[ed] an injury from final agency action." *Id.* at 809 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). The Supreme Court then reasoned that Corner Post did not have a "complete and present cause of action" until it began operating in 2018 and suffered "injury" under the regulation. *See id.* at 809, 825. After all, before the store opened its doors and accepted debit card payments, the regulation had no effect on it. *See id.* at 806–08. And so, calculating the statute of limitations from 2018, Corner Post's claims were timely under 28 U.S.C. § 2401. *See id.* at 825.

In so ruling, the Supreme Court in *Corner Post* resolved a circuit split, siding with the Sixth Circuit's approach in *Herr*. *Id.* at 806–07, 809. The plaintiffs in *Herr* bought property on Crooked Lake in Michigan in 2010. *Herr*, 803 F.3d at 812. Four years later, they sued the U.S. Forest Service over a 2007 regulation that prohibited the use of gas-powered motorboats on the lake, allegedly interfering with the plaintiffs' property rights. *Id.* at 818–19. The defendant argued that the statute of limitations began running at the regulation's publication in 2007, making the 2014 lawsuit untimely. *Id.* at 819. But the plaintiffs argued that the statute of limitations began running when they bought the property in 2010. *See id.* at 818–19.

Facing the same question as the Supreme Court in *Corner Post*, the Sixth Circuit explained that the APA's statute of limitations "begins to run when a party's 'right of action first accrues'—'as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court.'" *Id.* at 818 (citation omitted). And in the context of the APA, a party can sue "[o]nce the challenged agency action becomes final and invades a party's legally protected interest." *Id.* at 818–19. According to the Sixth Circuit, this moment may arise even

before a party is subject to enforcement proceedings. *See id.* at 818, 822 ("When a party *first* becomes aggrieved by a regulation that exceeds an agency's statutory authority more than six years after the regulation was promulgated, that party may challenge the regulation without waiting for enforcement proceedings.").

And this "makes sense" because "courts 'normally do not require plaintiffs to bet the farm . . . by taking the violative action before testing the validity of the law.'" *Id.* at 822 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 490–91 (2010)). That said, merely being subject to a regulation may aggrieve a plaintiff and first cause injury. *See id.* at 822. Applying these principles, the Sixth Circuit then explained that the plaintiffs could not be "'aggrieved' by the Forest Service's invasion of [their] property right until they became property owners on the lake" in 2010. *Id.* at 819. And it was then that their right to sue arose and the limitations period began to run. *Id.*

In sum, under *Corner Post* and *Herr*, an APA claim accrues—and the statute of limitations begins to run—after a plaintiff suffers injury from a final agency action and can sue for redress of that injury. *Corner Post*, 603. U.S. at 809, 825 (explaining that "[a]n APA claim does not accrue for purposes of 28 U.S.C. § 2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action" and thus "has a 'complete and present cause of action'"); *Herr*, 803 F.3d at 818–19, 822 (noting that a plaintiff can sue when he or she is first "aggrieved," which occurs "[o]nce the challenged agency action becomes final and invades a party's legally protected interest"). The Court now applies these rules to each of Plaintiffs' facial claims before discussing how these principles apply to their as-applied challenges.

A.      **Facial Due Process Challenges to Disqualification Procedures**

Plaintiffs argue that the limitations period for their due process claim began to run when the USDA disqualified them.  (ECF No. 50 at PageID 681–85.)  To a limited extent, the Court agrees.

As discussed above, a claim accrues when final agency action injures the plaintiff, allowing him to bring suit.  *See Corner Post*, 603 U.S. at 809; *Herr*, 803 F.3d at 822.  And agency action, which the Court discusses more below, includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  Agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The Court assumes there has been final agency action related to Plaintiffs' facial due process claim here, but it is a bit unclear when it first occurred.  Arguably, the final agency action arose when the USDA failed to create an appellate right.[8]  On the other hand, the final agency action may have been when the USDA first disqualified a plaintiff's horse.[9]  Even so, the Court need not decide this issue now because the injury arises at the same time in either case.

---

[8] Because failing to act is agency action, 5 U.S.C. § 551(13), the USDA's failure to have procedures for appealing disqualifications is agency action.  And that decision could be final because the USDA's decision to promulgate an entire scheme of regulations that did not include appellate procedures "mark[s] the 'consummation' of" its "decisionmaking process" related to soring disqualifications.  *See Bennett*, 520 U.S. at 178.  Indeed, the USDA had assessed what regulations it needed and chose not to include one for appealing disqualifications.  And this choice ultimately "determined" the "rights or obligations" of those in the horse training and competition industry because it denied them a right to challenge disqualifications.  *See id.*
[9] Even if the failure to create an appellate process were not a final agency action, disqualifying a horse certainly is because it occurs only after the USDA has made its ultimate decision that the horse is unfit for a particular show or competition.  And this affects the owner's and trainer's liberty and property rights to compete with that horse.  *See Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179, 183 (6th Cir. 1983) (explaining that, under the HPA and its regulations, horse trainer

Regardless of when the final agency action took place, a party has not been injured by the lack of appellate proceedings until he has something to appeal. After all, how could a regulation (or lack thereof) aggrieve someone who has never sought its protections (or protections he believes should exist)? And so, the claim would not arise until a plaintiff suffered some disqualification. That said, according to the Second Amended Complaint, Plaintiffs suffered appealable disqualifications in 2022, so the facial due process claim may have accrued then. But discovery may show that Plaintiffs suffered disqualifications before 2022, in which case, Plaintiffs' injuries and the right to challenge the appeal procedures facially may have *first* accrued years earlier. In any case, this is not a question for a motion to dismiss. The Court instead accepts Plaintiffs' allegations as true and finds that they have plausibly alleged a timely facial due process challenge.

## B.    Facial Challenges to the Scar Rule

Defendants next argue that Plaintiffs' challenges to the Scar Rule are untimely. (ECF No. 50 at PageID 681–85.) And again, the Parties dispute when the claim accrued. (*Id.*; ECF No. 51 at PageID 705–10.)

As explained above, a claim accrues when a party suffers injury from a final agency action. *Corner Post*, 603. U.S. at 809, 825; *Herr*, 803 F.3d at 818–19, 822. Neither party questions whether the Scar Rule is a final agency action, and for good reason. The USDA proposed and adopted the Scar Rule as a formal regulation through the rigorous notice-and-comment process, suggesting that the adopted regulation is the "consummation" of the agency's

---

"appellants clearly face governmental intrusion upon such rights [to practice a chosen profession] and, therefore, may properly assert the application of due process considerations"); *McSwain v. Vilsack*, No. 1:16-cv-01234-RWS, 2016 WL 4150036, at *4 (N.D. Ga. May 25, 2016) ("The Court finds that Plaintiffs have a constitutionally protected interest in showing Honors without unreasonable government interference.").

"decisionmaking process." *Bennett*, 520 U.S. at 177–78; 9 C.F.R. § 11.3.  And the Scar Rule

sets out standards for determining whether a horse is a victim of soring, 9 C.F.R. § 11.3, thereby

"determin[ing]" an owner's or trainer's "rights or obligations" with respect to his liberty and

property interests in competing his horse, *Bennett*, 520 U.S. at 178.

But the parties dispute when Plaintiffs first suffered an injury because of the Scar Rule.

*See Corner Post*, 603 U.S. at 809; *Herr*, 803 F.3d at 822.  When a final agency action—like the

Scar Rule—regulates a party's conduct, the redressable injury occurs when that party must

conform his conduct with that regulation.  *See Herr*, 803 F.3d at 822.  At that point, he may seek

immediate relief.  *Id*.  With that in mind, Plaintiffs were first subject to the Scar Rule and needed

to conform their conduct by refraining from soring practices that would violate it when they

entered the horse training and competition industry.[10]  Each Plaintiff entered this industry over

six years before suing here in 2024.  (*See* ECF No. 49 at PageID 612 (stating that each Plaintiff

has been training horses for at least fifteen years).)  As a result, the APA's statute of limitations

bars Plaintiffs' facial challenges to the Scar Rule in Claims II, III, and IV.

## C.    As-Applied Challenges

Plaintiffs disagree with the analysis above, arguing that Defendants' distinction between

facial and as-applied challenges treats a remedy as "a separate cause of action," which "misstates

the law."  (ECF No. 51 at PageID 705–06.)  And they urge the Court to allow each claim to

proceed and then handle the issue of available remedies at the end.  (*Id.* at PageID 709–10.)  But

the Parties need not expend time and resources pursuing and defending against claims that will

ultimately fail as untimely.  Both the Supreme Court in *Corner Post* and the Sixth Circuit in *Herr*

---

[10] This is true even if the USDA had not enforced the provision against Plaintiffs.  After all, a
party need not "bet the farm" by violating the regulation "before testing the validity of the law."
*Herr*, 803 F.3d at 822.

distinguished between facial and as-applied challenges when they decided how the APA's statute of limitations applies. *See Corner Post*, 603 U.S. at 823 ("Put aside facial challenges like Corner Post's. Regulated parties 'may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them' or 'petition an agency to reconsider a longstanding rule and then appeal the denial of that petition.'" (quoting *Herr*, 803 F.3d at 821–22)). And because of these differences in the types of claims, the limitations period may bar facial challenges without affecting as-applied challenges. *See id.*

As discussed, Plaintiffs' facial due process challenge is plausibly timely, but their facial challenges to the Scar Rule are time-barred. Even so, because the horse disqualifications prompting this action all occurred within six years before Plaintiffs filed this lawsuit, the Court finds that any as-applied challenges related to those events are timely. In fact, Defendants "do not dispute" that as-applied challenges to the 2022, 2023, and 2024 disqualifications alleged in Plaintiff's Second Amended Complaint are timely. (ECF No. 50 at PageID 682 ("Defendants do not dispute that the portions of Counts I–IV challenging Plaintiffs' disqualifications are timely, or that Plaintiffs may raise arguments concerning the validity of the applicable regulations in seeking to overturn their specific disqualifications.").) *See also Stupak-Thrall v. Glickman*, 346 F.3d 579, 585 (6th Cir. 2003) (APA case noting that the statute of limitations is an affirmative defense that a defendant waives if not timely asserted). And so, these claims survive.

## II. Claims V–VII: Final Agency Action

Claims V, VI, and VII challenge more recent USDA action related to soring standards—an email about the Scar Rule and a post-show inflammation policy. (ECF No. 49 at PageID 641–45.) Defendants argue that neither the email nor the policy is a final agency action subject to judicial review. (ECF No. 50 at PageID 686–92.) But Plaintiffs counter that the rules have a

legal effect on them.  (ECF No. 51 at PageID 710–15.)  For the reasons below, the Court finds the Scar Rule and post-show inflammation policy are final agency actions.

Under the APA, a party may only seek judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see Bangura v. Hansen*, 434 F.3d 487.  Courts applying this analysis first look for agency action, which the APA defines as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  And an agency "rule" refers to "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

If there is agency action, a court then asks whether that action is "final."  An action is final if it meets two requirements.  First, it "must mark the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177–78.  In other words, it can be neither "tentative" nor "interlocutory." *Id.*  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178. The Court now discusses whether the Scar Rule email and the post-show inflammation policy are final agency actions.

### A.    Scar Rule Email

In March 2024, the USDA emailed horse inspectors, outlining changes in protocols for the upcoming season.  (ECF No. 49 at PageID 626–27, 641; ECF No. 49-1.)  One bullet point stated that the "USDA will no longer require hair loss associated with non-compliant tissue (i.e., non-uniformly thickened epithelial tissue or evidence of inflammation) in order to disqualify a horse."  (ECF No. 49 at PageID 626; ECF No. 49-1.)  Plaintiffs allege that this change in practice is improper because the USDA did not issue it via the formal notice-and-comment procedures of

the APA.  (ECF No. 49.)  But Defendants move to dismiss, arguing that the email is not a final

agency action subject to judicial review.  (ECF No. 50 at PageID 686–88.)

The Court finds that the email here is agency action under the APA.  The email is an

agency rule because it is a "statement" from the USDA that "implement[s]" or "interpret[s]" how

it intends to apply the Scar Rule when a horse does not exhibit hair loss.  *See* 5 U.S.C. § 551(4).

And it is "final" because it appears to be the "consummation" of the USDA's "decisionmaking

process."  *See Bennett*, 520 U.S. at 177–78.  After all, it sets out how the USDA planned to apply

the Scar Rule for the 2024 season.

The email was not a tentative or proposed approach, and it was not a temporary standard

when issued.  Instead, it went into immediate effect as the agency's decision about how to apply

the Scar Rule.  And legal consequences flowed from the email because, as Plaintiffs note, a horse

that may have been eligible to compete under the earlier enforcement approach may be

disqualified now.  *Id.* at 178 (explaining how the challenged rule was final because it "has direct

and appreciable legal consequences").  The Court thus rejects Defendants' argument that Claim

V fails because the Scar Rule email is not subject to judicial review.[11]

### B.    Post-Show Inflammation Policy

Plaintiffs allege that the USDA adopted a policy to disqualify horses for any post-show

inflammation—even if the inflammation "has a natural cause or was caused by legitimate in-

show activity."  (ECF No. 49 at PageID 611.)  And they argue the policy violates notice-and-

---

[11] That said, the Court hesitates over what kind of review is available to Plaintiffs here.  First, the
Court questions whether Plaintiffs may facially challenge the Scar Rule email because the USDA
rescinded it for the March 2025 season, potentially rendering the issue moot.  (ECF No. 68 at
PageID 829; ECF No. 68-2 at PageID 866.)  Second, even though as-applied challenges over the
email's substantive application to Plaintiffs' horses may be viable, Plaintiffs do not appear to
bring such a claim.  (*See* ECF No. 49.)  Instead, they seem only to assert a procedural challenge
to the email, which the Court addresses below.  (*Id.* at PageID 641–42.)

comment. (*Id.* at PageID 643–45.) But Defendants contend that the claim fails because there

has been no final agency action, so the policy is not subject to review. (ECF No. 50 at PageID

689–92.) The Court disagrees.

For this "policy," the USDA never issued an agency communication that stated

affirmatively that a horse would be disqualified if it experienced swelling from natural causes.

Rather, the USDA *removed* a sentence from its manual that said "when a horse suffers

inflammation as a result of a natural injury, the horse is not sore within the meaning of the

HPA," and two VMOs orally acknowledged this change.[12] (ECF No. 49 at PageID 627, 629

(emphasis omitted); ECF No. 49-4; ECF No. 50 at PageID 690.) This deletion serves as the

basis of Plaintiffs' claim.

The Court agrees with Plaintiffs that removing the language about inflammation from

natural causes from the USDA manual is an agency "rule." The manual is now silent about

natural causes. By removing the language, the USDA made a "statement" by omission that

applies to horse inspection practices and standards and that aims to "implement[ or] interpret"

the HPA and its soring and disqualification regulations about inflammation. *See* 5 U.S.C. 551(4)

(defining "rule"). Plaintiffs therefore have plausibly alleged a rule here. And as a rule, the

deletion constitutes "agency action" that may be subject to judicial review. *See* 5 U.S.C. 551(13)

(defining "agency action" as including a "rule"); 5 U.S.C. § 704 (limiting judicial review to final

agency actions).

---

[12] The Second Amended Complaint does not attach or quote the manual's language. (*See* ECF
No. 49 at PageID 611, 627–29.) And Defendants have not included the official language (or lack
thereof) in their motion to dismiss, though it appears they intended to do so. (*See* ECF No. 50 at
PageID 689 n.5 (interpreting Plaintiffs' claim as "a reference to the attached document" but
failing to include attachments).)

This agency action is also final because it reflects the USDA's ultimate decision on how to handle inflammation during the 2024 show season. *See Bennett*, 520 U.S. at 177–78 (explaining that a final agency action "mark[s] the 'consummation' of the agency's decisionmaking process"). And legal consequences flow from the manual change because horse inspectors could now disqualify a horse for natural, non-soring inflammation that may have been permissible before. *See id.* at 178 (explaining how the challenged rule was final because it "has direct and appreciable legal consequences"). And for these reasons, Plaintiffs have alleged plausibly that the post-show inflammation policy is a final agency action, and the Court will not dismiss Claims VI and VII on these grounds.

## III.    Claims V, VII: Notice-and-Comment Rulemaking

Defendants next argue that Claims V and VII fail because, even if the Scar Rule email and post-show inflammation policy are final agency actions, they do not require the procedural formalities of notice-and-comment rulemaking. (ECF No. 50 at PageID 692–93.) According to Defendants, the email and manual only interpret existing regulations and do not create new legal obligations, which does not require notice-and-comment. (*Id.*) Plaintiffs disagree, arguing that the rules are legislative. (ECF No. 51 at PageID 712–15.)

Agencies may issue two types of rules under the APA: legislative and interpretive rules. Distinguishing between the two "is an extraordinarily case-specific endeavor." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 609 (6th Cir. 2024) ("*Dep't of Educ.*") (quotation marks and citation omitted). Legislative rules "impose new rights or duties and change the legal status of regulated parties." *Id.* at 608 (citation omitted). Courts ask: "Does the new rule 'effect[] a substantive regulatory change to the statutory or regulatory regime?'" *Id.* (citation omitted).

Legislative rules have the full force and effect of law and undergo notice-and-comment rulemaking.[13]  *Id.*

On the other hand, interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)).  They "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required." *Dep't of Educ.*, 104 F.4th at 608 (citation omitted).

What is more, interpretive rules neither carry the force of law nor require notice-and-comment.  *Perez*, 575 U.S. at 96–97 ("[T]he notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." (quoting 5 U.S.C. § 553(b)(A))).  This is true whether the agency interprets a statute or regulation for the first time or replaces an existing interpretation with a new (and perhaps inconsistent) one.  *Id.* at 103 ("In the end, Congress decided to adopt standards that permit agencies to promulgate freely such [interpretive] rules—whether or not they are consistent with earlier interpretations.").  In fact, the Supreme Court has expressly rejected the idea that "an agency must use the APA's notice-and-comment procedures when it wishes to issue a new interpretation of a regulation that deviates significantly from one the agency has previously adopted."  *Id.* at 95.  For example, the Department of Labor's Wage and Hour Division in *Perez*

---

[13] Notice-and-comment rulemaking "means that an agency must publish a notice about the proposed rule, allow the public to comment on the rule, consider the comments, and issue a final rule setting forth the basis and purpose of the rule." *Dep't of Educ.*, 104 F.4th at 608 (citing 5 U.S.C. § 553(b)–(c)).

did not need to use notice-and-comment procedures to change its position on whether mortgage loan officers were exempt from the part of the Fair Labor Standards Act.  *See generally id.*

Because Claims V and VII assert violations of notice-and-comment requirements, the Court now discusses whether the Scar Rule email and post-show inflammation policy are legislative or interpretive rules.

### A.     Scar Rule Email

Plaintiffs urge the Court to decide that the Scar Rule email is legislative because it stated that the USDA "will *no longer require* hair loss" for a horse to be sore.  (ECF No. 51 at PageID 711.)  According to Plaintiff, this language "is an admission that, before March 15, the agency *required* hair loss to find a Scar Rule violation and after March 15 it changed that legal requirement."  (*Id.*)  But the Court disagrees.

First, despite the USDA's use of "require," the Scar Rule email does not have the characteristics of a legislative rule.  It does not change or add to the language of the Scar Rule by "impos[ing]" new requirements with which parties must comply.  *Dep't of Educ.*, 104 F.4th at 608.  It also fails to reject existing standards in the Scar Rule.  *Id.*  To the contrary, the Scar Rule remains entirely intact: trainers may not sore horses, the USDA will disqualify sore horses, and a horse with hair loss is sore.  (*See* ECF No. 49-1 at PageID 648.)  9 C.F.R. § 11.3; *see Dep't of Educ.*, 104 F.4th at 610 (explaining that the rules were legislative because, among other things, they conflicted with existing regulations).  But under the Scar Rule, a horse without hair loss may or may not be sore.  *See* 9 C.F.R. § 11.3 (prohibiting "other bilateral evidence of abuse indicative of soring including, *but not limited to*, excessive hair loss" (emphasis added)).  And the email simply echoes these same requirements: the USDA may disqualify a sore horse under the Scar Rule even if it does not have hair loss.

Second, the email does exactly what interpretive rules do: it "advise[d]" industry actors and the public of how the USDA would construe the Scar Rule moving forward, and it "explain[ed]" what evidence of soring would result in disqualification. *See Perez*, 575 U.S. at 97 (noting that interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers"); *Dep't of Educ.*, 104 F.4th at 608 (explaining that interpretive rules "track preexisting requirements and explain something the statute or regulation already required"). The Scar Rule requires certain parts of a horse's leg to "be free of . . . bilateral evidence of abuse indicative of soring including, but not limited to, excessive loss of hair." 9 C.F.R. § 11.3. And the email merely interpreted this requirement as meaning that hair loss is a reason, but not a requirement, for finding a horse sore under the Scar Rule.[14] (*See* ECF No. 49-1.)

In sum, the Scar Rule does not preclude a horse without hair loss from being sore, so setting out how the USDA will interpret the Scar Rule in that situation is not creating new requirements or restrictions to which horse trainers or owners must conform. This means that the USDA's email interpretation of soring under the Scar Rule is merely interpretive here. And as an interpretive rule, it is not subject to notice-and-comment requirements. Count V thus fails, and the Court **DISMISSES** it.

---

[14] That this interpretation contradicted with earlier practice does not matter. *See Perez*, 575 U.S. at 97 (finding that an interpretive rule failing to exempt mortgage loan officers from overtime wage rules did not require notice-and-comment even though prior interpretations exempted such employees). And whether the Scar Rule email proposes an interpretation that is consistent with the language of the Scar Rule itself is a different question from whether the email is an interpretive or legislative rule. Because Plaintiffs only raise the latter argument in Count V, the Court does not discuss the former here.

### B.    Post-Show Inflammation Policy

Similarly, the guidance about how the USDA will interpret and apply the post-show

inflammation policy is an interpretive rule that is not subject to notice-and-comment procedures.

In earlier years, the USDA expressly considered natural causes for inflammation, such as a horse

tripping itself or clipping one of its own legs, as outside the scope of the soring statute.  (*See*

ECF No. 49 at PageID 611, 627–28 ("[W]hen a horse suffers inflammation as a result of a

natural injury, the horse is not sore within the meaning of the HPA.").)  But, having deleted that

guidance from its inspection manual, Plaintiffs allege that the USDA no longer saves from

disqualification a horse who suffers inflammation from natural causes.  (*Id.*)  Plaintiffs believe

this change is legislative (ECF No. 51 at PageID 712–15), but Defendants argue it is interpretive

(ECF No. 50 at PageID 692–93).  The Court agrees with Defendants.

The HPA defines a horse as sore if, as the result of a person's action, a horse "suffers, or

can reasonably be expected to suffer, physical pain or distress, inflammation, or lameness . . . ."

15 U.S.C. § 1821(3).  Given this statutory language, omitting the inflammation sentence from the

USDA inspection manual is not a legislative rule because it does not require regulated parties to

do or refrain from doing anything new or different.[15]  *See Dep't of Educ.*, 104 F.4th at 608

(explaining that legislative rules "impose new rights or duties and change the legal status of

regulated parties").  In fact, the statute itself looks for inflammation as an indicator of soring, so

the change neither adds nor subtracts from the disqualification standards.  *See* 15 U.S.C.

§ 1821(3).  Put another way, engaging in certain practices that cause inflammation have always

---

[15] In fact, if Plaintiffs are correct that inflammation from purely natural causes may lead to
disqualification, the rule *could not* impose new restrictions or obligations on them.  Plaintiffs
could not change their conduct to prevent the swelling because its origin is natural and separate
from their actions.  Even if the parties disagree about what causes of inflammation are natural,
the Court addresses that argument in the next section.

violated the language of the HPA, whether or not the inflammation arises after a competition or

show or for engaging in otherwise permissible conduct.  *See id.*

Again, the USDA manual is now silent about "natural" causes.  The USDA has, at most,

changed its interpretation of what "inflammation" means under the HPA and its regulations to

include swelling from both natural and artificial causes.[16]  *See Perez*, 575 U.S. at 97 (noting that

interpretive rules "advise the public of the agency's construction of the statutes and rules which

it administers"); *Dep't of Educ.*, 104 F.4th at 608 (stating that interpretive rules "clarify a

statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely

track preexisting requirements and explain something the statute or regulation already required").

That said, the USDA has "advise[d] the public of the [USDA's] construction" of the HPA and

"clarif[ied]" the statutory term "inflammation."  The rule is therefore interpretive.  As an

interpretive rule, notice-and-comment procedures are unnecessary, and the Court **DISMISSES**

Count VII.

## IV.    Claim VI: Exceeding Statutory Authority

Lastly, Plaintiffs argue that the post-show inflammation rule exceeds the USDA's

statutory authority because it "requires inspectors to disqualify horses who show inflammation

even where that inflammation was caused by natural causes, such as the horse's performance in

the ring."  (ECF No. 49 at PageID 642–43.)  The Court is not so sure.

First, the post-show inflammation policy does not appear to "require[]" disqualification

for natural inflammation.  The inspection manual does not state that the USDA *will* disqualify

---

[16] The Court addresses whether omitting the sentence from the manual actually means that the
USDA will disqualify horses for natural inflammation, and whether it would be appropriate to do
so, in the next section.  But for now, the Court notes that trainers and inspectors may differ on
what caused inflammation and whether that cause is "natural."  This opinion does not deal with
those fact-specific situations and disqualifications.

horses for inflammation from purely natural causes.  It simply removed a statement that said it will *not* do so.  (*See id.* at PageID 629.)  Second, it is unclear that the USDA intends to disqualify horses for natural inflammation anyway.  In fact, the USDA acknowledges in its motion that "there *are* natural injuries that can occur in the show ring, and those injuries do not meet the statutory definition of 'sore' (*e.g.*, if a horse is spooked in the show ring and cuts itself while jumping the gate, that is an injury that is 'not made or caused by humankind.')."  (ECF No. 50 at PageID 694.)

Even so, based on the language in the manual, the USDA could disqualify horses for natural inflammation.  And the Court struggles to believe that such disqualifications would comply with the soring statute.  *See* 15 U.S.C. § 1821(3) (defining soring as requiring conduct "by a person").  But how the USDA defines natural injuries or inflammation is somewhat unclear.  (*See, e.g.*, ECF No. 50 at PageID 693–94 (the USDA arguing that using compliant horseshoes may violate the post-show inflammation policy); ECF No. 59 at PageID 817–18 (considering the otherwise permissible use of action devices or pads to constitute soring if it causes inflammation).)  Given this lack of clarity, the Court cannot decide whether these interpretations exceed the USDA's statutory authority and finds that Plaintiffs have plausibly asserted a claim that they do.[17]

---

[17] The Court remains skeptical of this claim.  After all, the policy itself does not say that the USDA *will* disqualify horses for natural injuries, so a facial challenge likely would not succeed.  And the USDA states that it will not disqualify horses for truly natural injuries, so it is similarly doubtful whether Plaintiffs' as-applied challenges will succeed.  Lastly, if the USDA's interpretation of what constitutes natural injury or inflammation is subject to the Court's review, the positions the USDA took in its briefing (that injury unrelated to human activity is not soring but that the use of otherwise permissible artificial show or competition mechanisms may constitute soring) suggests the USDA's approach is consistent with the HPA.

## <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** Defendants' motion to dismiss in part and **DISMISSES** Plaintiffs' facial challenges in Claims II–IV as untimely.  The Court also **DISMISSES** Claims V and VII because neither the Scar Rule email nor the post-show inflammation policy are legislative rules subject to notice-and-comment.  But the Court **DENIES** the motion to dismiss Claim I, any as-applied challenges in Claims II–IV, and Claim VI.

**SO ORDERED**, this 13th day of August, 2025.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE